By the Court.
Duer, J.
The motion'for a new trial must be granted, if either of the exceptions to the ruling of the chief justice was well taken, or we shall be of opinion that theverdict of the jury, upon the question submitted to them, was against evidence.
The first exception was to the refusal of the judge to non-suit the plaintiff. The ground of this exception is,' that there was no evidence that a delivery of the goods in controversy was demanded by the plaintiff, and refused by the defendants before, the issuing of the writ of replevin, and we were referred to several cases, as showing, that such a demand and refusal were necessary to be proved, to entitle the plaintiff to maintain his suit. The cases referred.to undoubtedly prove that where the goods replevied were in the possession of an innocent bailee, who neither knew, nor had any reason to believe, that they had been wrongfully, or fraudulently obtained, by the person from whom he received them, a demand, before the commencement of the suit, is indispensable ; but we cannot apply this rule to the present case without assuming in favor of the defendants the* principal question in dispute, namely, that they were holders for value, and without notice. If Ihey were, not only the refusal of the judge to nonsuit the plaintiff, but his charge to the jury, *162 and their verdict, were certainly erroneous, and it will be our duty to order a judgment of nonsuit, or grant a new trial; but, on the other hand, if the defendants had not acquired a title as against the plaintiff, which they certainly had not, if they are chargeable with notice of the fraud by which the goods had been obtained, a demand, before the commencement of the suit, was no more requisite to be proved than had the action been, brought against Jacobs himself, the perpetrator of the fraud. As this exception, therefore, presents exactly the same question as that to the charge of the judge, its separate consideration is wholly needless. There is no force in the objection that the replevin is in the detinet only. It is well settled, that this form of the action is not an admission that the possession was lawfully acquired by the defendant, but that the issue may be maintained by showing his wrongful taking ; and that this evidence, when given, renders proof of a demand unnecessary. If the defendants are chargeable with, notice of the fraud, their reception of the goods was a wrongful taking, in the same sense as the purchase by Jacobs. (Cummings v. Price, 3 Hill 282; Price v. Van Dyke, 6 Hill 614; Stillman v. Squire, 1 Denio 327; Zachrisson v. Ahman, 2 Sand. S. C. R. 68.)
We proceed then to consider whether the cause was properly submitted to the jury, and if so, whether their verdict is sustained by the evidence.
It is not denied that the purchase of the goods by Jacobs was a deliberate fraud, and that as against him the plaintiff had a perfect right to rescind the contract, and reclaim the property ; but as the defendants made a large advance upon the delivery of the goods, as their security, it has been contended, that the only question that could properly be submitted to the jury, was, whether in their dealings with Jacobs they had acted with- good faith, or were themselves parties, or privy to the original fraud. The more recent decisions in England, it is said, have established the law, that the title of a holder for value, can only be impeached, by showing, that he was either a party to the wrongful act by which the property was obtained, or must have known of its existence ; and that whatever suspicions, in the exercise of ordinary prudence, he ought to have entertained, and however gross his negligence, in not inquiring into the facts, yet, *163 unless the jury are satisfied of his actual knowledge, or belief,, he is entitled to their verdict. The cases upon which the learned counsel for the defendants relied, are Crook v. Jacks, (5 B. & Ald. 909,) Backhouse v. Harrison, (5 B. & Ald. 1098,) and Goodman v. Harvey, (4 Adol. & Ellis, 870,) and it must be admitted that they go to the whole extent of the positions which he advanced. In the- last of these cases, Goodman v. Harvey, it was held by the court of king’s bench, that actual mala fides was necessary to be proved, and found by the jury, and that except as bearing upon this question, proof, even of gross negligence, was immaterial—and by this decision Lord Denman said, . “ that the • last remnant of the contrary doctriné.- was swept away.” If these cases, therefore, must be regarded by us, as a just exposition of the law, and are applicable to the transfer of merchandise, as well as of- bank bills, or negotiable paper, the charge of the chief justice was certainly erroneous; and the demand of a new trial is not be resisted.
But with all possible respect for the learned tribunal by which these cases were decided, we cannot regard them, as evidence of the law, that we are bound to follow. The “ contrary doctrine” was, in our judgment^ too long, and too firmly established, by a series Sf decisions, and has too solid a foundation in principle, to be now overturned or shaken. As we cannot think, that the law, whether enacted by the legislature, or made known and established by prior decisions, may be altered at the pleasure of judges, we must adhere to the doctrine which the court of king’s bench has rejected ; and with this doctrine, the charge of the chief justice, we shall proceed to show, entirely corresponds.
He told the jury, that, “ as it was admitted that Jacobs had ’ obtained possession of the goods by fraud, and that the sale, as-between him and the plaintiff, was void, the defendant Phillips, into whose possession the property was traced, was- bound to show his title, which it was insisted he had done by his acceptance arid payment of the two drafts that had been given in evidence; that, if the jury should find that Phillips accepted the draft, in good faith, upon the credit of the goods, without any notice of the fraudulent manner in which Jacobs had acquired the possession, and without notice or knowledge of any *164 facts or circumstances which ought to have put him upon his guard, as a man of ordinary prudence, then his title was established, and the loss must fall upon the plaintiff.” We do not understand these directions to the jury, as casting the whole burden of proof upon the defendant, Phillips. A.s the fraud of Jacobs was admitted, Phillips was doubtless bound to show, affirmatively, that the goods had been transferred to him for value, but he was not bound to show, negatively, that no facts or circumstances were known to him, that ought to have put him upon his guard, as a man of ordinary prudence ; nor could the chief justice have meant to instruct the jury, that they had a right' to found their verdict upon the mere absence, or insufficiency of such negative proof. The fair and reasonable interpretation of the charge, and the meaning in which, we doubt not, that it was understood by the jury, is, that in order to warrant them, in finding a verdict for the plaintiff, they must be satisfied from the evidence that had been given, that the defendant, Phillips, had actual knowledge of the fraud of Jacobs, or of facts and circumstances that, in the exercise of common prudence, ought to have awakened his suspicions, and led him to inquire ; assuming as a principle of law, that, upon the latter supposition, the neglect to inquire was equivalent to positive notice." And, until the recent decisions in the king's bench, such, it will appear, had been the uniform language of all the courts, and all the judges in England and the United States, with the single exception of a nisi prius decision of Lord Kenyon, (Lawson v. Weston, 4 Esp. 4) which has been since expressly, and in terms overruled.
The oldest case in the English books is Miller v. Race (1 Burr. 452), in which it was determined for the first time, that negotiable instruments are an exception from the general rule, that a person, who has himself no title to a personal chattel, can pass no title to another. The dispute related to a Bank of England note for ¿621, which had been stolen from the mail; and the court held that the plaintiff, to whom the note, after it had been stolen, had been passed, for a full and valuable consideration, In the ‘ usual course of business, was entitled to recover against a clerk in the bank, who had detained the note when presented for payment. But, Lord Mansfield, in deliver *165 ing its judgment, laid stress upon the fact that there was no evidence of collusion, or of any unfair dealing, and remarked that, had the note been for ¿61,000 the case would have been suspicious, meaning, we. apprehend, that the magnitude of the note would then, by justifying suspicion as to the title of the holder, have rendered inquiry necessary. So in the next case, in the order of time, Grant v. Vaughan (3 Burr. 1516), in which a similar decision was made, in relation to a draft upon a banker, which had been lost ‘by the 'owner, Mr. Justice Wilmot, to guard against any mistake as to the grounds of the decision, was careful to remark, that the plaintiff, who had cashed the draft, “had acted with the greatest caution, and that there was no imputation or pretence of suspicion that he had any notice of its being lost.” It seems to us evident, that the term “ notice ” is here used by the learned judge in its full legal sense, that is, as embracing a knowledge of circumstances that ought to induce, suspicion or belief, as well as direct information of the fact; and it was plainly needless to advert to the caution with which the plaintiff had acted, if, however suspicious may be the circumstances, no degree or measure of caution is required.
Passing over the intermediate cases of Peacock v. Rhodes (Douglas 611), and Solomons v. Bank of England (13 East, 135), we reach the important and leading case of Gill v. Cubitt (3 B. & Cress. 466), in which the general question, as to the proper direction to be given to the jury, in all cases, in which a purchase without notice is relied on, as a valid title, was elaborately argued and was determined by the king’s bench, upon full deliberation. The action was brought by the plaintiff, claiming as the endorsee of a bill of exchange for ¿6500, against the defendant, as acceptor. It appeared, in evidence, that the bill had been stolen, and had been discounted by a clerk of the plaintiff, who was a bill broker, for a stranger, without inquiry. Upon the trial the Chief Justice Abbott submitted two questions to the jury : First, whether the plaintiff hpd given value-for the bill;. and, secondly, whether he had taken it under circumstances that ought to have excited the suspicion of a prudent and careful man ; telling them, that if they should be of opinion that the plaintiff had done so, notwithstanding that he had paid full value for the bill, the defendant would be entitled *166 to their verdict. The jury, under this charge (which is substantially the same as .that of our chief justice, in the present case), found a verdict for the defendant, which the plaintiff, upon the ground of the misdirection of the judge, moved to set aside. Upon the argument of this motion, the plaintiff’s counsel relied chiefly -upon the decision of Lord Kenyon, in Lawson v. Weston, that it is sufficient for a person who has discounted a bill, to show that he paid value for it, and that, if satisfied with the names of the parties, he is not bound to inquire into the title of the person from whom he receives it. But all the judges were of opinion, that this decision was incorrect, and that the direction, which the chief justice had given to the jury, was entirely proper, and therefore concurred in denying the application for a new trial. The chief justice admitted that the case was not distinguishable from Lawson v. Weston, but expressed his regret that a decision, tending so manifestly to encourage speculation and fraud, had ever been made, and Bayley and Holroyd, Justices, (two of the ablest judges that, during the last century, have adorned the bench,) concurred in saying, that although the question of good faith is that which is commonly submitted to the jury, yet this question involves that of due caution',-and he who discounts a bill, w" •out using due means to ascertain whether it had been honesiiy obtained by the holder, takes it at his own peril. The elaborate opinion of Mr. Justice Bayley contains a critical examination of all the former -cases, for the purpose of showing that, with the exception of Lawson v. Weston, they were in perfect harmony with the judgment, then to be rendered. In Doan v. Welling, (4 B. & Cress. 330,) which was an action for the recovery of a lost check, the question, whether the defendant had received it, under circumstances that entitled him to its avails, was submitted to the jury, exactly in the same terms, as in Gill v. Cubitt, and the jury, being of opinion that the defendant had-not used due caution, found a verdict for the plaintiff. Upon a motion for a new trial, it was insisted by the defendant’s counsel, that the true question to have been submitted to the jury, was, not whether the defendants had acted with due caution, but whether they..had acted, mala fide; and while he -admitted that Gill v. Cubitt was against him, -he coi *167 tended that it was at variance with prior decisions, and therefore ought not to be followed. But the argument of the counsel made no impression on the court, the chief justice declaring that his brethren, as well as himself, were entirely satisfied with their former decision.
The next case, and it is a very strong one, was in the common pleas, Snow and others v. Peacock and others (3 Bing. 406). The action was trover for a ¿6500 Bank of England note, of which the porter of the plaintiffs had been robbed. The note had been taken in exchange for smaller notes of the defendants, who were country bankers, by a clerk, from a person of whom he asked no questions, and knew and learned nothing, except the name which he gave. The clerk, however, who was a witness upon the trial, swore that he had no suspicion that the note had been stolen. One of the questions, which the Chief Justice Best left to the determination of the jury, was, whether the defendants had exercised due caution, and had observed the usual course of business in exchanging the note. The jury found a verdict for the plaintiffs, but added, that not the slightest suspicion attached to the motives of the defendants. The chief justice, in delivering his opinion, upon an application for a new trial, examined the subject in all its bearings upon principle, and upon the authorities; and we think, it would be difficult to find in the reports a more lucid and moré satisfactory judgment. A new trial, he said, had been moved for, upon the ground, that the only question that should have been left to the jury, was, whether the defendants had taken the bill, bond fide, and that want of caution. on their part was only to be received as evidence of mala fides J and it had been argued, that to permit any other question to be raised, would introduce great uncertainty; but he was clearly of opinion, that there was no foundation for the argument; no uncertainty could arise from a conflict in the decisions, since, he affirmed and subsequently proved, that the direction which he gave to the jury, “ was supported by the concurrent authority of all the decisions in bank,” nor could uncertainty arise from any difficulty in the application of the rule; that reasonable caution must be exercised, since every man in business is taught by his own daily experience what degree of caution ought to be used, and what *168 inquiries to be made. He then proceeded to vindicate, upon the grounds both of justice and policy, the direction that he had given, and to show, by a careful analysis, of the cases, its entire harmony with all the prior adjudications. The views of the chief justice were sustained by all his brethren, in their whole extent, and a new trial was consequently denied.
The next case to which we shall specially refer, Baynes v. Foster (4 Tyrwhitt 65), arose in the Court of Exchequer, during the period when that court, under Lord Lyndhurst as chief baron, deservedly attained its highest authority. The plaintiff had placed certain bills of exchange, in the hands of bill-brokers, for the purpose of being discounted, and the brokers, without his knowledge or authority, had deposited them with the defendants, as a security for large advances- made to themselves. The question was, whether the defendants had taken the bills under circumstances which gave them alien against the plaintiff, until their advances were satisfied. The jury, being of opinion that due caution had not been exercised by the defendants in taking the bills, found a verdict for the plaintiff, which the court, being of the same opinion as the jury, refused to set aside. In delivering the judgment of the court, Lord Lyndhurst said, in substance, that although a person who advances money on the deposit of bills has by law a lien on them against the owner, even when the party making the deposit had. no authority to pledge them, yet the rule is subject to this condition, viz., that the party with whom the bills are pledged is ignorant of the limited authority of the person making the pledge, and has no reason to suspect that his authority is restricted. The question, therefore, was, whether the defendants knew, or had good cause to suspect, that the brokers had received the bills from their customers merely for the purpose of being discounted ? If they knew the fact, they had no right to receive the bills as a security at all; and if they had cause to suspect it, they had no right to take them, without previous inquiry. That the circumstances of the case were such as ought to have excited the suspicions of the defendants; and as they had chosen to take the bills without inquiry, they had taken them at their peril, and not having exercised due caution, must abide by the result. To the cases that have been cited we add the *169 following :—Beckwith v. Carroll, 3 Bing. 444; Snow v. Saddler, 3 Bing. 610; Strange v. Wigney, 6 Bing. 677; Easly v. Crockford, 10 Bing. 243; Slater v. West, Dawson & Lloyd 15; Fancourt v. Bull, 1 Bing. N. C. 681—in all of which the principle is distinctly affirmed or plainly implied that the want of reasonable caution, on the part of a purchaser or bailee for value, in omitting to inquire, when just grounds of suspicion exist, deprives him of the protection to which he would otherwise be entitled, even in cases where his actual good faith is not questioned or doubted.
This review of the decisions justifies us in doubting whether, upon any question that has been at all a subject of litigation, we should be able to find a more entire consent of the authorities that we are accustomed, and in a measure, bound to follow ; and it may well excite our surprise that the judges of the king’s bench have felt themselves at liberty to repudiate a doctrine to which their predecessors, in all the courts, in the fullest conviction of its justice and expediency, had so long and so inflexibly adhered. Either the maxim that it is the duty of judges “ stare decisis,” must be exploded as groundless, or cases, which involve its flagrant violation, must be disregarded.
In the cases in our own courts, which relate to the transfer of negotiable instruments, the language of the judges, as to the necessity of caution, on the part of the holder, when he had cause to suspect the title which he received, is explicit and positive. In all the cases the question is stated as involving proper diligence, as well as good faith. In Wiggins v. Bush (12 John. 306,1815), the action was brought by the endorser of a promissory note against the defendants, as makers, and the court held that the plaintiffs had such information as ought to have led to the inquiry as to the manner in which the note had been obtained by the payee, and that their neglect to make this inquiry subjected them to all the consequences of the transaction between the immediate parties ; and as between the parties, the note was fraudulent and void, it followed that the plaintiffs could not be entitled to recover. The earliest case in the United States, so far as we have discovered, is Ayer v. Hutchings, which was decided in 1808 by the Supreme Court of Massachusetts (4 Mass. 370). It is not necessary to state the special circumstances of the case, *170 but the rules which, as unquestionable law, governed its decision, were stated by that eminent judge, Chief Justice Parsons, with singular brevity and force. He said, that the maker of a promissory note cannot give in evidence against an innocent endorsee, who came honestly by the note, without any reason to suspect that it was not good, any illegality in the consideration, or fraud- in obtaining it—but where the endorsee receives the note under circumstances which might reasonably excite suspicion, he ought, before he takes, it, to inquire into its validity, and if he does not, he takes it subject to any legal defence that would defeat a recovery by the payee. Done v. Baldwin (12 Pick. 545), was also an action by an endorsee against the maker of a negotiable note. The court, upon the whole case, rendered judgment for the plaintiffs, but in delivering their opinion, Wildes, J., admits the principle that if the circumstances attending the transfer of negotiable paper are such, as ought to put an endorsee upon his guard, he is bound to inquire—and if he do not, he purchases at his peril.
In Hill v. Hale (8 Connec. 336), the case turned upon the question, whether the plaintiff, who was an endorsee for value of a promissory note, and whose actual good faith was not impeached, had .exercised due caution in receiving the transfer. The jury had found a verdict for the defendant, the maker of the note, which the supreme court of Connecticut set aside as not justified by the evidence, but in delivering its judgment, Hosmer, Chief Justice, stated that “ the law was well settled, that if an endorsee take a bill without due caution, and under circumstances which ought to have excited the suspicions of a prudent and careful man, the maker, acceptor, or prior endorser, may be let into his defence,” and he referred, among other cases, to Gill v. Cubitt, as sustaining the position. The verdict was set aside, upon the ground that the judge, upon the trial, had misled the jury by exacting from the plaintiff the utmost possible caution, instead of that reasonable caution which prudent men usually exercise. Vide also, Holmes v. Sharpas, 5 Binn. 469; Sandford v. Norton, 14 Vermont 228; Nicholson v. Patton, 13 Louis. 213.
There is another, and a numerous, class of cases resting upon the same principle, that he who ought to suspect is bound to *171 inquire. We refer to the successive decisions, which have settled the rule that an endorsee for value of a negotiable instrument, which when endorsed had passed its maturity, takes it subject to any and every defence that could be successfully urged against his immediate endorser. This rule" is constantly applied without the slightest reference to the actual good or bad faith of the endorsee ; and we are not aware that any other reason for its adoption has ever been given, except that the mere circumstance, that the note or bill was over due, ought to have excited suspicion and prompted inquiry. It is thus that Chief Justice Parsons, and Chancellor Kent, explain and vindicate the rule, and we should seek in vain for the protection of higher authority. (4 Mass. 373; 3 Kent’s Com. 81.)
Nor is this all. It is evident upon a slight consideration, that the cases which we have cited," are only a special application of the general doctrine of constructive notice, and unless they are to be received as law, that doctrine, long established as it lias been, and extensively as it prevails, ought to be wholly abandoned. It is either unsound in principle, or is universal in its application ; and if it is justly applied to the transfer of real estate, the exemption of personal, would be a capricious anomaly.
The principle of the doctrine of constructive notice is, that’ when a person is about to perform an act by which he has reason to believe that the rights of a third party may be affected, an inquiry into the facts is a moral duty, and diligence an act of justice. Hence, he proceeds at his peril when he omits to inquire, and is then chargeable with a knowledge of all the' facts that by a proper inquiry he might have ascertained. This neglect is followed by all the consequences of bad faith, and he loses the protection to which his ignorance, had it not proceeded from neglect, would have entitled him. The cases are innumerable in which this doctrine has been applied in courts of equity to purchasers and mortgagees of real estate, and there are many in which it has operated to divest, the title of those whose actual good faith was unsuspected. The rule, that it is only purchasers for value and without notice, who, in certain cases, may oppose their title to that of the true owner, we have .always believed and must still believe, is the same in courts of law as of equity, and in both, we cannot doubt' that the term *172 notice must receive the same interpretation. It must either be limited to strict knowledge, which is derived from positive information, or must be extended to that which the law imputes to him, who, having reason to believe or suspect, refuses or neglects to inquire. y
Nor is constructive notice an arbitrary doctrine, or an unwise attempt to enforce by law a rule of morality. It is founded upon a deep knowledge of human nature, and is justified by the soundest reasons of public policy. It will rarely happen that a knowledge "of the fraud, or other fatal vice, by which the title he received was infected, can be brought home to the purchaser by positive evidence, yet to release him in all cases from the obligation to inquire, is to determine that, in all cases, such evidence shall be given. On the other hand, when it is manifest to the minds of a jury that just ground of suspicion existed, we may be certain as a general rule, that the suspicion was felt by the purchaser, and that he chose not to inquire, because he was resolved not to know. Constructive notice may doubtless operate in some cases, to defeat the title of deceived and innocent purchasers, but its general effect is to reach those, who meant, by their voluntary ignorance, to cover their fraudulent intent; and it is in truth so essential to the protection of deceived and innocent owners, that to abolish it, would be to encourage, if not by the promise, yet by the certain hope of impunity, dishonesty, collusion, and fraud.
We are aware that Judge Story, in his treatises on bills of exchange and promissory notes, has quoted the more recent cases in the king’s bench, (Backhouse v. Harrison, and Goodman v. Harvey, etc.) with seeming approbation, and considers them as having overruled the opposite doctrine, which, he admits, had long prevailed (Story on Bills of Exch. 194, Story’s Prom. Notes, 177), and it is because he has done so, that we have bestowed more care upon the examination of this case, than, otherwise, we should have thought to be necessary. The alteration of the law, which the decisions in the king’s bench, if followed, would effect, is regarded by us, not merely as an unwarranted stretch of judicial power, but as erroneous in principle, a,nd dangerous in its consequences; and it is the apparent sanction that has been given to it by Judge Story, arid our just fear of the *173 influence of his name, that have induced us to explain, so fully, the grounds of our decision.
In closing this discussion, we deem it scarcely necessary to notice the objection, that the decisions on which we rely, relate exclusively to the transfer of negotiable instruments, and that it is to such cases that the application of the principle which they establish, should be confined, since we cannot doubt that this principle, the necessity of reasonable caution, applies to the disposition of other personal chattels, not only with equal propriety, but, if there is any distinction, with an increased force. From an enlightened regard to the interests of commerce, the transfer of negotiable paper is regarded by the law with peculiar favor : and, from the time of Lord Mansfield, judges have displayed a marked anxiety, that no restraint, not plainly necessary, should be imposed upon its free circulation. And, hence it is, that the innocent purchaser, who has exercised due caution, may derive a valid title, even from a robber. No title, however, as against the true owner, can be given to goods that have been stolen or lost, yet, where the possession has been acquired from the owner by fraud, a subsequent disposition is not necessarily void. The transfer in such cases, is an exception from the general rule, “ that no person can give to another a better title than his own,” in the same sense, although by no means to the same extent, as in the transfer of bank bills, and other negotiable instruments. But, although a fraudulent vendee may pass a valid title, it would be unreasonable to suppose that the conditions, on the part of the purchaser, of a valuable consideration, of good faith, and of reasonable caution, are not, at least, as indispensable in the one case, as in the other ; nor have any arguments been offered, nor authorities cited, to show that such a distinction exists. For a very clear, though condensed statement of the entire law upon this subject, we shall content ourselves with referring to the able opinion 'of a distinguished senator, in the case of Salters v. Everett (20 Wend. 274, 286). He observed, that where the possession and the apparent right of property in goods, has been obtained by fraud, and they are subsequently sold, it is only the honest purchaser who buys for a valuable consideration, in the course of trade, without notice of any adverse claim, or of any circumstances which might lead *174 a prudent man to suspect such adverse claim, who will be protected in his title against the original owner.” (Senator Verplanck’s opinion, ut sup. p. 277.) Whether the defendant Phillips was a purchaser entitled to protection under this definition, is the question that, in our judgment, was distinctly submitted to the jury.
As the exceptions to the charge of the judge, and to his refusal to non-suit the plaintiff,, must be overruled, the only question that remains, is, whether the verdict of the jury is sustained by the evidence, and this wé shall answer in few words.
Two of the judges are of opinion that no other verdict than that which was given, could properly have been rendered, and, although some doubts are felt by their associate, he is very far from thinking that the verdict is so plainly unsupported by proof, that the discretion of the court would be fitly exercised by setting it aside. The question was exactly one of those which jurors, generally speaking, are far more competent to decide, than judges, and, in such cases, it is only a verdict, which was the manifest result of haste -or prejudice, that ought to be disturbed.
The motion for a new trial is denied.