H. H. MEARS & SON, plaintiffs below, plaintiffs in Error,v.
JOSEPH WAPLES, defendant below, defendant in Error.

To constitute a commercial usage that the copy of a bill of lading attached
by a pin to a draft drawn at one day's sight for the price of a cargo
purchased and shipped by the drawers in Philadelphia on account of and
in the names of the drawees in Baltimore, to be delivered at Boston,
unto order, or assigns, is not to be detached from it by the drawees
on the presentation and acceptance of the draft, but is to remain at-
tached to it until the payment of the draft, it must be recognized and
acted on as such in both of the cities first mentioned, as well as have the
usual requisites such as certainty, reasonableness and uniformity.

The proof of a usage of trade involves questions both of law and fact. It
is a question of law what is sufficient usage to bind the parties, that is
to say, for how long a time, at what places, and with what degree
of uniformity it must have been observed. Therefore, whether a given
state of facts establishes the usage claimed to exist is a question for the
Court; whether such a state of facts has been proved is a question for
the jury. And if, taking all the evidence to be true that is relied on to
prove it, in the opinion of the Court it is not sufficient to establish the
usage contended for, it becomes their duty to so instruct the jury.

The mere fact that a bill of lading is forwarded attached to a draft, and
not separately, is not demonstrative of an intention to make the bill of
lading a security for the payment of the draft. They are not made one
instrument by such a connection, nor can they be, except by some ref-
erence in the one to the other to express such an intention    Neither
is it a conditional or cash sale of goods to be paid for on delivery, or a
conditional delivery of the bill of lading, so as not to pass property in
the cargo until the draft is paid. But if they were so, a subsequent
*bona fide* indorsee of the bill of lading and purchaser of the cargo with-
out noti- e of such condition, will be protected against the claim of the
original vendor, the same as an innocent purchaser of goods obtained by
fraud from the original vendor. Under a conditional sale followed by
the delivery of the goods not expressly qualified, the vendee takes a title
to them which though it may be defeasible between the original parties,
like title fraudulently obtained, it will be protected in an innocent pur-
chaser from such vendee.

The voluntary delivery of a bill of lading consigning goods " to order or
assigns " confers all the external *indicia* of the right of disposal. It is
a declaration to the commercial world that the person receiving it may
dispose of the goods. To allow the vendor who has delivered such a bill
of lading to set up against a *bona fide* indorsee of it for value, any pri-
vate conditions between him and his vendee, would be a fraud on the

indorsee, and must impair confidence in this class of commercial securities. Such an indorsee of such a bill of lading is presumed in law to to be a *bona fide* purchaser of the goods without notice of the condition, or of fraud, or bad faith on the part of the indorser in obtaining the possession of it, or of the goods, or of any thing that should have led him reasonably to suspect it, until the contrary appear; and in the mean while the *onus* of proving such notice rests on the party impugning his purchase on such grounds.

ON WRIT OF ERROR to the Superior Court for New Castle County at the May Term 1868, and Bill of Exceptions filed to the charge of the Court to the jury in the case below. For the statement of the case and the charge of the Court to the jury, *see H. H. Mears & Son*, v. *Waples* 3 *Houst. Rep.* 581.

*Gray*, for the plaintiffs. The first exception to the charge that the Court below erred in admitting Montgomery Hunt to testify as a witness for the defendant in the trial of the case, was waived and abandoned, and he would therefore proceed to the consideration and discussion of the four remaining exceptions taken to the charge, but not in the order in which they had been filed, and in which they then stood before the Court, for he would consider them collectively as covering the several grounds which he intended to take in his argument, and on which he thought the Court below had erred in the instructions given to the jury in the case. When in a sale of personal property the purchaser obtains the possession of it fraudulently, without the knowledge and consent, and contrary to the intention of the vendor and owner of it, he gains no right or title whatever to it, and can make or give none to it. *Hil. on Sales* 332. *Ch. on Contr.* 321. *Load* v. *Green*, 15 *M. & W.* 216. *Hawes* v. *Crow.* 21 *E. C. L. R.* 784. *Erving* v. *Motley*, 20 *E. C. L. R. Bristol* v. *Wilsmore*, 8 *E. C. L. R.* 219. If the possession in such case was delivered to him by the vendor, it confers but a voidable or defeasible title upon him, which may be revoked by the vendor when he discovers the fraud which has been prac-

ticed on him in the transaction; and as the purchaser in such case takes a tainted title in the goods, he can give or convey to another, no better title to them than he has himself to them. *Lickbarrow* v. *Mason*, 1 *Smith's Ld. Ca.* 1048. *Mason* v. *Lickbarrow*, 1 *H. Black.* 357. 2 *T.R.* 63. 6 *East.* 21. *Andrew* v. *Deitch*, 14 *Wend.* 34. *Keable* v. *Paine*, 11 *Wend.* 80. *Saltus* v. *Everett*, 20 *Wend.* 74, 77. *E. C. L. R.* 672. 11 *Casey* 239. When, however, such purchaser has sold and delivered the goods to a subsequent *bona fide* purchaser who has purchased them without any knowledge, or notice of, or good reason to suspect, the existence of the fraud by which his immediate vendor acquired the possession of them, the title of such subsequent purchaser will not be tainted or affected by it, on the contrary, it will constitute a good and valid title; but the burden of proof rests upon him to show to the satisfaction of the jury that he had no knowledge or notice of, or good reason to suspect, the existence of such fraud before he became the purchaser of them, and not, as was charged by the Court in this case, upon the party on whom the fraud was committed, the first vendor of them, when asserting his title and contesting that of such subsequent purchaser, on the ground which vitiated and avoided the sale of them by him to the intermediate purchaser. And the rule, as he had thus stated it, was especially applicable to the transfer of bills of exchange and promissory notes, and should be to bills of lading. although they were only *quasi* negotiable instruments, but were transferable by indorsement, as much so as promissory notes and bills of exchange were. *Miller* v. *Race*, 1 *Smith's Ld. Ca.* 597. *Gill* v. *Cubitt*, 10 *E. C. L. R.* 215. In such cases the party taking the bill or note is bound to prove that he paid value for it, and that he exercised due diligence and took it without having any reason to suspect that the person from whom he received it procured it fraudulently or dishonestly.

But the analogy between a bill of lading and a bill of exchange or promissory note went no further than he had just stated; for although they were transferable by in-

dorsement, and when delivered to the indorsees of them would constitute a symbolical delivery of the goods named in them, and for that purpose represented them, they do not possess the full negotiability, or any of the other incidents or characteristics which appertain to the indorsement of bills of exchange or promissory notes. In this case, however, Quincy & Co. were bound to prove, not only that they gave value for the bill of lading and cargo represented by it, but also that they exercised due caution and circumspection, made proper and prudent inquiries in relation to it and the parties from whom they were about to take it, and that they took it without any suspicion, or reason to suspect, that M. Hunt & Co. came by it fraudulently, or that they intended by the transfer and transmission of it to them, to defraud the plaintiffs in any manner in that transaction. Because the taking of the bill of lading by them, in such a case, could confer upon them no better title than the delivery of the cargo of corn represented by it, if the cargo itself had then been actually delivered to them. But the evidence showed that they were not without suspicions that all was not right in the matter, and that they thought by getting the draft which accompanied it from the Bank in Boston, it would give them a good title to the cargo, whatever irregularity, impropriety or fraud there might have been on the part of M. Hunt & Co. in the transaction. And, herein, it was that the Court below had erred in charging the jury that the plaintiffs in the action were bound to prove, not simply that Quincy & Co. had knowledge or notice of, or grounds to suspect that M. Hunt & Co. were contemplating a fraud on them in the transaction, when they received the bill of lading and accepted the draft of M. Hunt & Co. upon them, but in the strong and emphatic language employed by the Court, that they had "guilty knowledge" of such a design or intention—a phrase of peculiar import and significance, and certainly more appropriate to characterize the knowledge of a crime than of a fraud merely in any transaction. *Hall v Featherstone*, 3 *Hers. & Norm.* 284. *Millis v. Barber*, 1 *M. & W.* 425.

*Monroe v. Cooper*,5 *Pick.* 512.    *Bailey v. Bidwell*,13 *M. & W.* 73. 1 *Wheat. Sel. N. P.* 266.    *Rogers v. Morton*,12 *Wend.*484. *Vallette v. Parker*, 6 *Wend.* 615.    *Miller v. Race*, 1 *Smith's Ld. Ca.*,607. *Raphael v. Bank of England*,84 *E. C. L. R.*,160. *Copeland v. Bosquet*,4 *Wash.* 594.    The fact merely that M. Hunt & Co. had applied to them for an advance of $10,000 only on a cargo of corn then worth $14,000, in Boston, should of itself have suggested some suspicion,and put them on the inquiry as to their reasons for such an application. But there was nothing in the charge to show that the Court left it to the jury to consider and determine whether Quincy & Co. had any reason to believe or suspect whether there was anything wrong or fraudulent on the part of M. Hunt & Co. in the matter.    On the contrary, it expressly instructed them that it was incumbent upon the plaintiffs in the action to prove to their satisfaction that Quincy & Co. in fact had knowledge that there was fraud intended on the part of that firm towards the plaintiffs in obtaining the possession of the bill of lading without paying for the cargo which they were about to, or had consigned to them, before they accepted their draft for the $10,000 on account of it.

But in point of fact no right or property in the cargo under the facts proved in the case passed from the plaintiffs to M. Hunt & Co. By the contract between them the corn was to be paid for in cash on the delivery of it by them, which was to be on board the vessel in Philadelphia, and that constituted it a conditional sale, that was to say, to become their property on the payment of the stipulated price for it by them, and not till then; and the fact that afterward at their particular request, the draft of the plaintiffs for the price of it was drawn at one day's sight with the bill of lading attached and transmitted to them in Baltimore, which it reached the next day, did not alter the character of the sale, as a sale of goods for cash on delivery, (and this character and condition of it, of course,Montgomery Hunt well knew) and, therefore, he as well knew when he detached the bill of lading from the

draft at the time he accepted it, and the same day indorsed it and transmitted it to Quincy & Co. attached to the draft drawn by him at the same time on them on account of the consignment of the cargo to them, and thus attempted to sell and transfer it absolutely to another before he had paid the plaintiffs for it, that it was contrary to the contract and a flat violation of the condition of sale and a gross fraud upon the plaintiffs, for the commercial usage or custom then prevailing in that particular trade or business, clearly showed that it was the established practice and understanding both among merchants in that trade and the Banks in Philadelphia, that a bill of lading so attached to a draft as that was, was to remain so as a security for the payment of it, and was not to be detached or separated from it until the draft was paid. And such was the understanding, design and expectation of the plaintiffs when their draft with the bill of lading attached was transmitted for acceptance and collection through the Bank in Philadelphia and the Bank in Baltimore to the firm of M. Hunt & Co. The failure of that firm in two or three days after that nefarious transaction but too clearly proved that the gross fraud thus perpetrated upon the plaintiffs was deliberately designed and premeditated by them at the very time when they wrote to the plaintiffs to thus draw on them at one day's sight with bill of lading attached, as soon as the cargo of corn was shipped in Philadelphia. This preconcerted scheme by which they evidently obtained the possession of the bill of lading, as the fraudulent use they made of it so speedily after getting the possession of it clearly demonstrated, would distinguish this case from that of *Hall v. Hinks* 21, *Md.*, which he presumed would be cited on the other side, because in that case the possession of the goods was not fraudulently obtained by the purchaser contrary to the intention of the vendor, but they were voluntarily and absolutely delivered by him to the agent of the purchaser without any fraud or deceit practiced upon him to obtain the possession of them. And in support of this distinction and the position he had

last assumed, he would also cite *Cogill v. N. H. & H. R. R. Co.* 3 *Gray* 545. *Blackb. on Sales* 120. 150. 1 *Smith's Ld Ca.* 889 to 901. 1 *Pars. on Contr.* 538. *Dekan v. Shipper,.* 11 *Casey* 239. *Saltus v. Everett,* 20 *Wend.* 265. The broad principle for which he would contend in conclusion was this, that by reason of the flagrant fraud proved in the case on the part of M. Hunt & Co., particularly in the transaction last referred to, the sale of the corn to them by the plaintiffs was a sale absolutely void *in toto*, and that they, therefore, took no title whatever under it to the property,. and could give none to Quincy & Co., and that the court below erred in charging the jury to the contrary.

*Whitely*, (*Comegys* with him) for the defendant. The plaintiffs by letter and in person contracted with M. Hunt & Co. to sell them about twelve thousand bushels of corn and to ship it to the order of the latter which was done, and thereupon the plaintiffs drew upon them their draft at one day's sight for the price of it with the bill of lading attached. Originally at law, as a general thing, the ownership of personal property was only evidenced by the possession of it, and the only way of acquiring title to it by sale and delivery was by purchase in market overt, as it was termed : and such continued to be the law until the case of *Lickbarrow v. Mason,* in which it was first ruled in England, and it had since been the law there, that in a conditional sale and delivery of goods to a purchaser, a subsequent *bona fide* purchaser of them from him for value without notice of the condition, takes a good and valid title to them as against the original vendor. *Lickbarrow v. Mason,* 1 *Smith's Ld. Ca.* 388, 429, 432, 433, *Wright v. Campbell,* 4 *Burr.* 2046. *Parker v. Patrick,* 5. *T. R.* 175. *Slubey v. Hayward,* 2 *H. Black.* 504. And that was the law in this country. 6 *Met.* 68. 4 *Greenl.* 345. 1 *Paige* 386 12 *Pick.* 306. 2 *Paige* 492. 9 *Gill & Johns.* 220. 8 *Conn.* 243. 8 *How.* 384. 12 *Johns.* 348. 14 *Wend.* 31. *Root v. French,* 13 *Wend.* And notice of such condition must be proved by the other side to invalidate such a sale and defeat the title of the subsequent purchaser, for it is not incumbent upon

him in the first place to prove that he had no knowledge of it, but if a purchaser for value, he is presumed to be an innocent purchaser until the contrary appears.

In the case of *Dowl v. Green*, 16 *Barb*. the court would not permit the defendant to go into proof of the fraud practiced by the first purchaser on the vendor,until he had first proved that the subsequent purchaser had notice of it, and had thus connected the subsequent purchaser with the fraud of the first purchaser in the case. But the sale in this case was an absolute and unconditional sale and delivery of the cargo of corn in question by the plaintiffs to M. Hunt & Co., and, therefore, neither the question or principle of law discussed was relevant to it. The plaintiffs by shipping it on board of the schooner in their name as the owners and consignors of it, were estopped from impeaching the right and title of Quincy & Co. to it on the ground of any alleged or actual fraud practiced upon them by M. Hunt & Co. in the purchase of it, until they had satisfactorily proved that Quincy & Co. took it with knowledge of the fraud. Their inquiry a short time afterward, and after they had received the bill of lading and accepted the draft of M. Hunt & Co. for $10,000, in regard to the character and standing of that firm of which they had no knowledge up to that time, and what was done by their request at the Boston Bank in relation to the draft, instead of furnishing the slightest proof that they had any knowledge of, or even reason to suspect that the firm of M. Hunt & Co. had been guilty of any fraud whatever in the transaction, was really nothing more than what any prudent man would have done under the circumstances. A conditional sale in this regard stood precisely on the same ground as a fraudulent sale, and in law there was no essential difference between them. 2 *Kent's Com.* 642. *Hil. on Sales* 114, 332. *Hussey v. Thornton*, 4 *Mass.* 435. *Lupen v. Maree*, 2 *Paige* 169. *Cogill v. Hill*, 4 *Denio* 324. And *Hall v. Hincks*, 1 *Md.* 406, rules that the principle is the same when the sale of the goods is on a condition not performed by the first purchaser, and when the

possession of them is obtained by him under the sale by fraud or fraudulent misrepresentations, and in the two cases the title of the subsequent *bona fide* purchaser without notice of the condition or the fraud will be equally protected. In the case of *Copeland v. Bosquet* cited on the other side, it was in proof that the subsequent purchaser knew when he purchased the goods that the person from whom he bought them had obtained the possession of them through fraud practiced upon the party from whom he purchased them. And the same was the case in *Saltus v. Everett*, except that in the latter case, the goods in fact never had been sold by the owner of them to the party who had fraudulently obtained the possession of them and sold them to the defendant, and who had no knowledge of the fraudulent means by which he had acquired them.

But a bill of lading absolute and unqualified upon its face, as this was, could not be limited or restricted, altered, contradicted or explained in the hands of a *bona fide* indorsee of it without notice of them, by any parol terms, agreement or understanding between the original parties to it, both on the ground of the general principle of evidence applicable to written instruments, and the negotiability of of such commercial paper.

The principle of law contended for upon the other side was also subject to the further objection that it would impose upon the subsequent purchaser in such a case, the obligation and necessity of proving a negative.

*T. F. Bayard*, for the plaintiffs. In this case the plaintiffs were fraudulently deprived of the goods in question, and the record of the suit now before the Court fully warranted the assertion. It was not, however, a case of stoppage *in transitu* like that of *Lickbavrow v. Mason* which proceeded and was based simply on the insolvency of the vendee and the lien of the vendor and his right to reclaim the goods sold for the unpaid purchase money ; but in this case the right to rescind the sale is based entirely on the fraud of the vendee in the original purchase. The principle con-

tended for on the other side, as a general rule of law on the subject, constituted but an exception in fact to the general rule to the contrary. Because there was certainly no sound reason for holding that where one of two upright and innocent owners or holders of property must lose it through the fraud of an intervening third party in the purchase and sale of it, the loss must necessarily fall on the first party deliberately cheated out of it under the false pretense of a purchase, for if not so, the consequence would be that he has put it in his power on the other hand to cheat the second just as badly. The maxim of *caveat emptor* imposes quite as strong an obligation on the second or subsequent purchaser to exercise the strictest prudence and precaution as to the right of the party to sell from whom he purchases the goods, as it would seem to impose upon the original vendor with regard to his credit and integrity before selling and delivering them into his possession, and consequently they should stand *prima facie* upon equal grounds, at least, as to any loss resulting from it in contemplation of law.   1 *Smith's Ld. Ca.* 897.   *Saltus v. Everett,* 20 *Wend. Verplank's Opinion.*

When goods are sold on condition, as where they are sold on the condition that they shall be paid for on delivery, the purchaser acquires no title to them, until the condition is performed and they are paid for. *Black. on Sales,* 121, 151.   And if he has no title, he can pass none, of course, to another.   The cargo of corn in this case was not sold by the plaintiffs to M. Hunt & Co. on a credit, but for cash; for such was the contract of sale between them, and the draft at one day's sight by which it was to be paid for, was neither designed, nor was it understood by either of the parties to it to alter or vary the terms of the contract in that particular, for it was proved on the trial by the concurrent testimony of all the witnesses examined on that point, that a sale on such terms, or to be paid for within the time such a draft would mature, or even in ten days, is uniformly considered in commercial circles as a sale for cash, or to be paid for on the delivery of the goods;

and the Court below was particularly asked to charge the jury in accordance with this principle of law, that as the firm of M. Hunt & Co. had failed to pay for the corn on delivery pursuant to the terms of the sale, it never acquired any legal right or title to it, but which the Court declined to do. *Powell v. Bradley*, 9 *Gill & Johns.* 268. *Cogill v. N. H. & H. R. R. Co.*, 3 *Gray* 545. *Copeland v. Bosquet*, 4 *Wash.* 591.

According to the decisions in this country, if the holder of negotiable paper takes it from another under suspicious circumstances, he is bound to show that he exercised due care and caution in taking it. 1 *Smith's Ld. Ca.* 748. 752. In the case of *Deckan v. Shipper*, 11 *Casey*, the Court held that as it appeared in the bill of lading that the purchaser was described as simply an agent, it was sufficient to put the consignee upon his guard and to defeat his title to the goods bought of him as his property. In another case it had been held that the fact that the holder had taken the bill of lading from an entire stranger without any inquiry as to how he came by it, was sufficient to defeat his right to recover upon it, and in the case cited on the other side from 16. *Barb.*, the Court said that the plaintiffs having proved that they took the bill without any suspicion of fraud and in good faith and paid a fair consideration for it, it was sufficient. And yet, the Court below in this case wholly ignored all that was contended for by the counsel for the plaintiffs on this point, and not only refused to instruct them as requested, but charged them directly to the reverse or contrary of it, and to which ruling they had excepted in terms equally earnest and decided.

A bill of lading was only a *quasi* negotiable instrument, and may be explained by evidence *aliunde.* It does not transfer the right to the goods, but is only a symbol of them, and when delivered itself is only a symbol of the delivery of the goods, and like the delivery of the goods themselves, the delivery of it is a question of fact and is always subject to explanation. *Blackb. on Sales*, 288.

*Bates, Chancellor,* delivered the opinion of the Court.

The proof and the points of controversy are fully set forth in the charge of the Court below, and need not be here re-stated. We, therefore, proceed immediately to consider the exceptions. They are five in number. The first exception, being to the admission of Montgomery Hunt as a witness, was abandoned during the argument in this Court. The second exception is to the refusal of the Court below to charge in accordance with the plaintiffs' first prayer for instructions to the jury. By that prayer the Court was requested to submit to the jury the question whether or not the sale of corn by H. H. Mears & Son to M. Hunt & Co. was a *cash* sale,—a sale by the terms of which property in the corn and possession of the bill of lading was not to pass to M. Hunt & Co. until payment of the draft for the price. It was one branch of the plaintiffs' case that the sale was for cash and not on the personal credit of M. Hunt & Co., that payment of the draft and delivery of the bill of lading were to be contemporaneous, and that it was in order to effectuate this arrangement that the bill of lading and the draft were attached to each other when the latter was forwarded for acceptance and collection. It was, therefore, insisted that the separation of the bill of lading from the draft upon its acceptance only and before its payment, was contrary to the terms of sale, without right, and that it passed no property in the corn,—that M. Hunt & Co., as they had acquired no title to the corn, could pass none by their indorsement of the bill of lading to T. D. Quincy & Co., even though the latter were innocent pur-chasers for value. To support this branch of their case the court was requested to charge the jury as to the legal effect of a cash sale, and to instruct them that should they find this to have been such, and that the bill of lading was attached to the draft as security for its payment at maturity that then M. Hunt & Co. took no property in the corn and could convey none. The Court below refused the instruc-tion prayed for ; not that it questioned the legal proposi-tion that if a bill of lading be obtained by fraud, or other-

wise than under a voluntary delivery by the owner of goods, its indorsement can pass no title even to an innocent purchaser; but the court considered the evidence adduced by the plaintiffs insufficient to support a verdict finding that there had been no delivery of this bill of lading to M. Hunt & Co., or in other words, finding that the bill was attached to the draft to secure its payment and was unlawfully detached upon its acceptance only. We are of the same opinion. Let us advert to the evidence on this point. The assumption that this was a cash sale rests upon the single fact that the bill of lading was attached to the draft instead of being forwarded to M. Hunt & Co. separately. All the other circumstances present the ordinary case of a sale upon personal credit. The corn is shipped to the order of M. Hunt & Co.; bills of lading are made out in their names, as for a cargo " Shipped by M. Hunt & Co.," to be delivered to their " order or assigns;" the schooner with the cargo is permitted to depart; the price is drawn for at one day after sight, and the draft is discounted for the drawers, Mears & Son, at the Philadelphia Bank. Now, it must be obvious, that had the draft gone on without the bill of lading attached to it the case would not afford even color to an argument that this was a cash sale. Then the material question is whether there was sufficient evidence to go to a jury in support of the plaintiffs' hypothesis that the bill of lading was attached to the draft as a pledge for its payment at maturity.

Examining the bill of exceptions to this point we observe, in the first place, that there was no evidence of any express agreement between H. Mears & Son and M. Hunt & Co. that the bill of lading should remain with the draft until its payment, or be held in any way as a security for the draft. Nor was there evidence of any instruction given either by H. Mears & Son to the Philadelphia Bank, where the draft was discounted, or by that Bank to the National Union Bank of Baltimore, to which it was sent for collection, to the effect that the bill of lading should

remain with the draft until its payment. Nor, again, can any such agreement, understanding or instruction be implied from the previous course of dealing between these parties; but the contrary—for throughout a series of like sales of corn running through a period of four years and amounting to an aggregate of $150,000 to $200,000, in the course of which the purchases were paid for by drafts at one or three days' sight, M. Hunt & Co. had uniformly, upon accepting a draft for the price of a cargo, detached and kept the bill of lading: and this was done without objection ever made on the part of H. Mears & Son. In a single instance the collection clerk of the Baltimore Bank did, on presenting a draft for acceptance, object to the separation from it of the bill of lading, but he withdrew the objection upon being informed by Mr. Hunt that such had been their previous practice. There is in this circumstance nothing to rebut the presumption arising from the uniform course of business between these parties, that Mears & Son relied upon the credit of Hunt & Co. and permitted the bills of lading to be delivered upon acceptance of the drafts. Then, in the absence of express agreement pledging the bill of lading, of any understanding implied from previous course of dealings, even of instructions from H. Mears & Son, upon what grounds was the right of M. Hunt & Co. to detach the draft impeached? Two grounds were taken in argument. First, and chiefly, was the ground of usage,—that according to the custom of this trade, a bill of lading, when attached to a draft for the price of the cargo, stands as security for payment of the draft. Was the evidence relied on to prove such usage sufficient to carry this question to the jury? We think not. Waiving any inquiry as to the sufficiency of the evidence adduced to show the existence of a usage in Philadelphia, there was no evidence whatever of such usage in Baltimore, where M. Hunt & Co., the parties to be affected, resided and transacted their business, and to which place the draft was sent for collection. This was a fatal defect, such as the court could not over-

look.   For it is indisputable that any usage of a particular trade carried on between two different seats of the trade, like Philadelphia and Baltimore, in order to bind parties to a transaction between the two places, must be a usage recognized and acted on in both ; for otherwise there can be no fair presumption that the parties,—both parties, dealt with reference to it.   It should be observed that the usage in question is not asserted as one of those general commercial usages which, having become a part of the law merchant, are recognized by the courts without proof, such as are many of the rules relating to bills of exchange, promissory notes and insurance ; but this is claimed to be the usage of a particular trade, and in that trade, if existing at all, it is local.   It must, therefore, be proved to have been recognized and acted on at the places embraced by the transaction as well as to have had the usual requisites, such as certainty, reasonableness and uniformity. As to the nature and requisites of such a usage we adopt entire the instruction of the court below.

It was, however, earnestly argued that whether or not a sufficient usage had been proved was a question of fact which should have been left wholly to the jury.   But the proof of a usage of trade involves questions both of law and of fact.   It is a question of law what is a sufficient usage to bind the parties, i. e., for how long a time, at what places and with what degree of uniformity it must have been observed; whether, therefore, a given state of facts establishes the usage claimed to exist is a question for the Court;—whether such a state of facts has been proved is a question for the jury.   If, as in the case presented by this record, taking all the evidence relied on by the plaintiffs to be true, it is not, in the judgment of the Court,sufficient in law to establish the usage contended for, it becomes the duty of the Court so to instruct the jury.   Such has been the uniform practice of the Courts upon these questions. One case out of the many may serve as an illustration.   In *Wood v. Wood,* 11 *E. C. L. R.,* 312, the defendant had sent to a trader in cloths certain cloths for inspection.   The

trader becoming bankrupt, in a suit between his assignees and the owner of the cloths, the owner attempted to prove a usage of the cloth trade that when cloths were sent for inspection, if within three days the trader did not give notice of his willingness to buy them, they should be returned. According to the testimony the time allowed the buyer varied  Some of the witnesses stated it to be three days, some a week and one a month. The Court instructed the jury that such a usage to be binding must be uniform, and that the usage, taking it as proved, was not so. *Parsons on Contracts*, 2d *Vol.* 543, draws very clearly the line of distinction between the province of the Court and that of the jury as to the proof of usage.

The other ground upon which the plaintiffs' counsel sought to impeach the right of M. Hunt & Co. to detach the bill of lading upon accepting the draft was, that even in the absence of express agreement or of usage, the bare fact that the bill of lading was forwarded attached to the draft, and not separately by mail, was demonstrative of an intention to make the bill of lading a security for the payment of the draft. The argument was pressed so far as to hold the draft and the bill of lading to have been made one instrument in law. On the latter point it must be clear that the mere connection of the two papers by a pin could not alter the legal operation of either instrument. The operation of each depended only upon its own terms; nor could they be made in any sense one instrument, or the operation of one be qualified by the other, except by some reference in the one to the other; as if in the bill of lading for example, it had been provided that the title under it to the cargo should not pass until payment of the draft. Then, again, with respect to the supposed conclu- siveness of this fact (the connection of the two papers) in itself as evidence of an intention to pledge the bill of lad- ing for payment, while it is doubtless true that the papers were connected for some purpose, it is not to be assumed that this purpose was to make the bill a security for pay- ment of the draft; for the object may as well have been to

make the delivery of the bill and the acceptance of the draft contemporaneous, so as on the one hand to secure to the vendor an acceptance of the draft before delivery of the bill of lading, and on the other hand to assure the acceptor that the goods had gone forward.   So that the bare fact that the two papers were sent attached to each other proves nothing; its meaning must be interpreted by the other circumstances of the case; all which,as we have seen, point to a sale upon the personal credit of M. Hunt & Co. and not for cash to be secured by the bill of lading.   We are therefore of opinion that the Court did not err in refusing the first prayer for instructions.

We next proceed to the 3d. Exception.   This is to the omission of the Court below to instruct the jury according to the 2d prayer.   The plaintiffs claimed that the sale,if not a cash sale,was at least a conditional sale,—that the bill of lading, if delivered at all, was delivered conditionally, so as not to pass property in the corn until payment of the draft;—that consequently, as the vendee took by such a delivery no title until payment, his indorsement of the bill could, as against his vendor, pass none.   By the 2d prayer the Court was requested to charge that in order to pass a title to M. Hunt & Co. which they could convey, " the delivery of the goods, or of the documentary title to the same must be an unconditional one, and that a delivery of a bill of lading may be so explained that its true intent may appear."   The prayer is imperfectly expressed, but its connection with the first prayer and the scope of the argument show its meaning to be that under a conditional sale of the corn and delivery of the bill of lading, M. Hunt & Co. took no property in the corn which in the event of their failure to pay the draft they could pass, even to an innocent indorsee for value.

The Court instructed the jury to the contrary; " that a *bona fide* purchaser without notice of the condition upon which his vendor had acquired possession of the goods will be protected against the claim of the original vendor."   The Court treated such a purchaser as being entitled to

the same protection which is universally accorded to an innocent purchaser of goods obtained by fraud from the original vendor. We are unable to distinguish between the two cases. Both are alike within the principle established as far back as in *Lickbarrow v. Mason*, that "wherever one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it." But it was urged upon us that this principle of protection to innocent purchasers is qualified by another rule of law, viz : that he who has no title in himself can pass none ; as, for example, a bailee of goods hired or loaned ; that a conditional sale and delivery of goods pass no title, no more than does an ordinary bailment ; that nothing passes but a bare possession until performance of the condition. That one having no title to goods can pass none (except anciently by sale in market overt) is unquestionable. But that rule does not govern the present case, and this for two reasons. First, then, in our judgment the delivery of goods by a vendor pursuant to a sale, though it may have been a conditional sale, is more than a bailment of them. The delivery might be so expressly qualified as to pass only a bare possession until performance of the condition. Upon this ground stands *Copeland v. Bosquet*, 4 *Wash. C. C.* 588, one of the two cases relied on by the plaintiffs. But in the absence of any stipulation to the contrary the fair presumption is that the vendor, by delivering the goods before the condition is performed, waives the condition and trusts to the responsibility of his vendee. *Cogill vs. The Hartf. & New Haven R. R. Co.* 3 *Gray* 545, holds the contrary ; but we cannot follow the reasoning of that case. The conclusion of the Court in *Hall vs. Hinks et al.*, 21 *Md. Repts.* 406, seems to us better sustained, and we accept it as the true rule. It results, that under a conditional sale followed by a delivery of the goods, not expressly qualified, the vendee does take a title to them,—which though it may be defeasible between the original parties, like title fraudulently obtained, will in like manner be protected in an innocent

purchaser from the vendee.  But, second, the other rea-
son, more conclusive and the one more appropriate to the
facts of the case, springs from the use of a bill of lading.
It is an exception, universally admitted, to the doctrine
that one having no title to goods can by a sale pass none,
that when the owner in the language of Ld. Ellenborough
( 9 *East.*) " has given the external indicia of the right of
disposing of his property," a *bona fide* purchaser, for value
from the person holding such evidence of title will be pro-
tected against the original owner although no title in fact
was in the person who committed the wrong.   This prin-
ciple is fully acknowledged in *Saltus vs. Everett*, 20 *Wendell*
267,–280,cited for the plaintiffs; also in 2 *Smith's L. C. Am.
note*, 1096,–7.   Now the delivery of a bill of lading, con-
signing goods " to order or assigns " confers all the exter-
nal indicia of the right of disposal.   It is a declaration to
the commercial world that the person receiving it may
dispose of the goods.   To allow the vendor who has deliv-
ered such a bill of lading to set up against a *bona fide* in-
dorsee for value any private condition between him and his
vendee, would be a fraud on the indorsee and must unset-
tle confidence in this class of commercial securities.   Let
it be observed that we are not dealing with the question
whether bills of lading are so far negotiable, like bills of
exchange and promissory notes, that the indorsement of
one by a person who obtained it, not by a voluntary deliv-
ery, but by fraud, force or theft, will pass title to an inno-
cent indorsee.   The question here raised is whether a vol-
untary delivery of a bill of lading for goods sold expressly
consigning them to the vendee's order, can be qualified by
any private condition to the prejudice of a *bona fide* indor-
see for value.

We proceed to the 4th exception, which is taken to the
refusal of the Court below to charge in accordance with
the 3d. prayer. It was one of the grounds of the plaintiffs'
claim that even had there been an absolute delivery of the
bill of lading, such as to vest a title in M. Hunt & Co., yet
that the purchase of the corn was obtained fraudulently,

and that consequently their title was revocable by the plaintiffs; and that too even as against T. D. Quincy & Co., the indorsees, unless they were purchasers for value and without notice or knowledge of the fraud; and the character of *bona fide* purchasers was denied to them. To sustain this denial was the object of the 3d prayer. This prayer is twofold:—(1st.) that the Court would submit to the jury the question whether or not the bill of lading was taken under suspicious circumstances, without reasonable caution on the part of T. D. Quincy & Co.; and (2d) that the Court would instruct the jury that supposing fraud in M. Hunt & Co. to be shown, the *onus* was on T. D. Quincy & Co., to prove affirmatively that they bought " *bona fide*, for value and without notice of any defect in the title of M. Hunt & Co. The Court refused to submit to the jury whether the bill of lading was taken under suspicious circumstances, and held the indorsees to be *bona fide* purchasers within the sense of the rule, if they took the bill for value and without notice or knowledge of any fraud. In this instruction the Court followed the rule settled by the later English and American decisions touching the rights of an indorsee of negotiable paper which has been fraudulently put into circulation, stolen, or lost. *Raphael vs. The Bank of England,* 84 *E. C. L. R.* 160, decided in 1855, may be taken as the exponent of this rule, which is that a *bona fide* indorsee for value, without notice or knowledge of any defect of title, is not put to diligence. The question is one, not of diligence, but of *bona fides.* Therefore negligence in the indorsee, if not so gross as to prove *mala fides,* does not defeat his right. It has been by several gradations and after much discussion that the English Courts have reached this conclusion. The doctrine first held in any decision upon the direct question by the court in banc, was that known as Ld. Tenterden's rule in *Gill vs. Cubitt,* 10 *E. C. L. R.* 154, *in* 1824, that the title of the holder of negotiable paper, though a holder *bona fide* and for value, would not be protected, if acquired " under circumstances which ought to have excited the

11

suspicions of an ordinarily prudent and careful man," and, accordingly, in that case the question of negligence was left to the jury. Ld. Tenterden's rule was followed until the year 1836, when in *Crooks vs. Jadis*, 10 *E. C. L. R.* 234, and in *Backhouse vs. Harrison, ib.* 276, under Ld. Denman, the strictness of the former rule was so far relaxed that only gross negligence, and not mere want of caution on the part of the indorsee, was held sufficient to defeat him. A still further relaxation was yielded in *Goodman vs. Harvey*, 31 *E. C. L. R.* 212, where Ld. Denman says, " we are all of opinion that gross negligence only would not be a sufficient answer where the party has given consideration for the bill." " Gross negligence," he proceeds to say, " may be evidence of *mala fides*, but is not the same thing. We have shaken off the last remnant of the contrary doctrine. When the bill has passed to the plaintiff without any proof of bad faith in him, there is no objection to his title." Following this decision was *Uther vs. Rich*, 37 *E. C. L. R.* 232; also the *Bank of Bengal vs. Fagan*, before the Judicial Committee of the Privy Council, 7 *Moore's P. C. Cases* 72, and finally *Raphael vs. the Bank of England.* In the privy Council case, Ld. Brougham said, " It may be taken as established that whatever may have been the law laid down in *Gill vs. Cubitt* and one or two other cases is now law no longer; and that the negligence of the party taking a negotiable instrument does not fix him with the defective title of the party passing it to him." The American decisions on this point have taken a somewhat similar course. The earlier rulings were in accordance with Ld. Tenterden's doctrine. A few of the later cases, decided since that doctrine was abandoned in England (1836) still adhere to it. *Pringle vs. Phillips*, 5 *Sandf.* 157 ; *Holbrook vs. Mix*, 1 *E. D. Smith* 154 ; *Sandford vs. Norton*, 14 *Vermt.* 228 and 17 *ib.* 285. But the weight of American authority is now with the present English rule. *Worcester Co. Bank vs. Dorchester & Milton Bank*, 10 *Cush.* 488. *Brush vs. Scribner*, 11 *Conn.* 388. *Hall vs. Wilson*, 16 *Barb.* 548. *Magee vs. Badger*, 30 *Barb.* 246. *Mathews vs. Poythress*, 4 *Ga.* 287. *Goodman vs. Simonds*, 20 *How.* 343.

This course of adjudication was a necessary concession to the demands of commerce. What are " circumstances which ought to excite suspicion," or what is " reasonable diligence," are questions answered by no legal definition that may guide either commercial dealers or juries. To subject commercial transactions entered into *bona fide* to the hazards of a jury trial upon questions so indefinite would seriously embarrass, if not paralyze commerce. These considerations, we think, apply with equal force to bills of lading, as to bills of exchange and promissory notes, and the court below did not err in treating bills of lading as within the same rule. In this case it was not controverted that the indorsees took the bill of lading in the course of their trade and for value. Then, according to the rule, the question whether there was negligence in taking the bill under suspicious circumstances was not proper to be left with the jury, unless there had been evidence tending to fix them with gross fraud, such as proves *mala fides*, in which case that question, the question of *mala fides*, should have been submitted to the jury. But after carefully weighing all the evidence relied on for the plaintiffs we are clearly of opinion that it does not in any degree tend to show gross negligence, or indeed, any negligence on the part of Quincy & Co. in taking the bill of lading, and that the Court would have erred in leaving that question to the jury upon such evidence.

We pass now to the other question raised under the 3d prayer for instructions, i. e., supposing it to have been shown that M. Hunt & Co. obtained the corn fraudulently, to what extent the *onus* was thereby thrown upon the defendant to prove the *bona fides* of T. D. Quincy & Co. as indorsees of the bill of lading. We take the rule to be this; after evidence has been adduced that a bill of exchange, promissory note, or bill of lading has been obtained by fraud or duress, or has been lost or stolen, a party claiming as indorsee, in order to maintain his title must show that he took the paper for a valuable consideration, and in the case of a stolen or lost bill or note, he

must also show how he came by it, that he took it in the
course of trade; but having made such proof he is not
required further to show affirmatively his want of notice
or knowledge. The payment of value for a bill or note
taken in the course of trade raises a fair presumption that
the holder took it *bona fide* and without knowledge of any
defect of title; for men do not pay their money for titles
known to be defective. Besides, the want of notice is a
negative fact, not susceptible of affirmative proof; and it
would be unreasonable to exact this of a party after he
has shown himself to be a purchaser for value in the course
of trade. 2 *Parsons on Notes & Bills* 280. *Raphael v. the
Bank of England,* 84 *E. C. L. R.* 160. *Dows v. Green,* 16
*Barb.* 72. *Hart v. Potter,*4 *Duer* 458, cited in 1 *Parsons* 188
note *n.* and *Ross v. Bedell,* 5 *Duer* 462, cited *ib.* We con-
clude then that the Court below did not err in refusing to
charge according to the 3d prayer for instructions.

It only remains to consider briefly the last exception.
It is taken to the phraseology in which, when the jury
returned to the bar, the court re-stated that part of the
charge which referred to the *onus* of proof as to T. D.
Quincy & Co's. knowledge of fraud on the part of M.
Hunt & Co. We find nothing in the re-statement differing
in substance from the original instruction, and nothing in
its language calling for observation except the use of the
phrase " guilty knowledge," which it is insisted was calcu-
lated to mislead the jury as implying that the indorsees
would be affected only by such knowledge as arises from
privity with fraud in M. Hunt & Co. On this point the
original instruction was explicit, that any knowledge of an
antecedent defect of title would defeat an indorsee, though
such for value paid. There was nothing said suggestive
even of the idea that only participation in the fraud of
their vendor would defeat the claim of these indorsees.
Now, what fell from the court upon the return of the jury
for further instruction was intended only as a re-statement
of the charge on that point; and so it must have been
understood; for the Court, expressing anxiety to guard

against possible misapprehension, read again to the jury that part of the charge referred to. The phrase " guilty knowledge" was manifestly used as an antithesis to the terms " innocent purchaser" just before employed. It would, we think, have been so understood even had not the charge on the point referred to been read in connection; but any erroneous impression which the phrase standing alone might have made must have been corrected by the charge as read. We should presume in favor of the common sense of the jury.

The judgment of the court is that all the exceptions be overruled and that the judgment of the Court below be affirmed.